Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Brendan F. Porter, Bar #034781
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85281
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com
Email: bporter@wienekelawgroup.com

*Attorneys for Defendant Bertz*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Roland G. Harris, Jessica Perez; and Rodasia White, as Mother and Next Friend of A.H. and J.H, the minor children of victim, as beneficiaries for the wrongful death in and violation of civil rights of Jacob Michael Harris,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix, Kristopher and Jane Doe Bertz, David and Jane Doe Norman, John and Jane Does 1-10, Entities 1-10,<br><br>Defendants. | NO. 2:20-cv-00078-DLR<br><br>**DEFENDANT BERTZ'S MOTION FOR SUMMARY JUDGMENT** |

Of the four individuals in a vehicle that fled from police after committing the latest in a lengthy series of violent armed robberies and aggravated assaults, the decedent was the only one who exited the vehicle. Of the four individuals who fled from police, the decedent was the only one with a gun in his hand as he fled the scene. Of the four individuals who fled from police, the decedent was the only one who ran in the direction of an occupied convenience store. And of the four individuals who fled from police, the decedent was the only person who was shot because of the choices that he made. Because Defendant Bertz's conduct was justified under Arizona law, Defendant hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. BACKGROUND.

### A. The Crime Spree and Guilty Pleas

The events in this case were the culmination of a weeks-long crime spree in which decedent—along with three other accomplices—committed over two dozen armed robberies, aggravated assaults, and kidnappings at fast-foot restaurants, Circle K stores, and Whataburger restaurants. *See* Maricopa County Superior Court, CR2019-101931; CR2019-007275. Jacob Harris previously worked at Whataburger and used that experience to gain inside information that he would use for criminal purposes—he would quit around the time the robberies began. (Ex. 1, PHX00688; Ex. 2, PHX009667 (jpg190, jpg 0381)). Harris and his crew were termed the "Mass Bandits" by robbery detectives. (Ex. 3, PHX1929-1939). When a search warrant of Harris' apartment was executed following the shooting, 9mm bullets, a Glock ammunition magazine, counterfeit money, clothing seen in prior robberies, the spoils from prior robberies, and his journal documenting his plans for criminal enterprises were discovered: "Ways of getting $$$: bank scam, rapping, pimping, robbing, claims, selling drugs, selling cars, script scam, selling guns, uber, suing, CF's." (Ex. 4, PHX—9667 (jpg0024, 0234, 0337, 338, 340-345, 397, 516, 526, 549, 574, 577, 585).

Jeremiah Triplett, Sara Busani, and J.R.—the three co-conspirator members of the Mass Bandits—pled guilty to the armed robbery of the Whataburger on January 11, 2019, as well as manslaughter for the shooting death of decedent (because Harris' death occurred during their flight from the Whataburger felonies). (Ex. 5, Plea Agreement of Triplett; Ex. 6, Plea Agreement of J.R.; Ex. 7, Plea Agreement of Busani). As part of their pleas, the Mass Bandits admitted—under penalty of perjury—to a factual basis that asserted that decedent was with them when they entered the Whataburger, had a handgun during the robbery, forcibly took money from the employees, got back into the Honda Passport, and drove for several minutes without stopping. (Ex. 5 at 7, 15-16; Ex. 6 at 8, 16-17; Ex. 7 at 9, 15-16). They also admitted that Phoenix Police officers forcibly used devices to stop the Honda, while decedent exited the vehicle after the vehicle had been stopped by police. (*Id.*). They avowed that "[b]ut for Defendant's, Co-Defendants', and [decedent's] actions of

forcibly taking money from [Whataburger employees], while armed with weapons, and driving away from the Whataburger together inside the Honda Passport, [decedent] would not have sustained gunshot wounds causing his death." (Ex. 5 at 15-16; Ex. 6 at 16-17; Ex. 7 at 9, 15-16).

### B.   The Whataburger Armed Robbery and Flight.

The particular event that gives rise to the issues in this case was an aggravated assault, kidnapping, and armed robbery of a Whataburger restaurant on January 11, 2019.[1] On January 10, 2019, Officers Bertz and Norman, who were Special Assignments Unit Officers, were assigned to assist with the arrest that would occur if probable cause was developed to arrest the Mass Bandits crew. (Ex. 8, Deposition of Officer Bertz, at 132:2-14; 238:19-239:5). Officer Bertz knew the group of individuals at issue were suspected "to be involved in upwards of 26 armed robberies over the past several weeks or months, to include, I believe, convenience stores like Circle K types, I think a cell phone store, several cell phone stores. And as I recall, one of the most recent robberies being investigated was at a Whataburger where they had obtained a more substantial amount of money on that robbery." (*Id.* at 198:1-200:25).

The Mass Bandits had been under surveillance—both ground and aerial—for several hours prior to the Whataburger robbery as they drove around in a Red Honda Passport. (Ex. 9, Air Unit CAD, at PHX001522; Ex. 10, Full CAD, PHX001428-1500, at 1486-1489; Ex. 8, at 197:6-9; 201:10-203:4). During that surveillance, the Mass Bandits were photographed handling firearms—a silver Airsoft pistol and a black 9mm Taurus handgun—and casing businesses. (Ex. 11, Surveillance Photographs, PHX00042, 46, 48, 50, 56, 59, 62, 63, 66). Jacob Harris was photographed with the Taurus handgun in his waistband at one business. (*Id.* at 10). After the shooting, that black 9mm Taurus handgun was recovered from the

---

[1] The armed robbery, aggravated assault, and kidnapping of employees at the Whataburger by the Mass Bandits—that Phoenix Police Department officers witnessed—occurred beginning at approximately at 11:44 PM on January 10, 2019. (Ex. 9, Air Unit CAD, PHX001525). As most of the events in this litigation occurred in the early morning hours of January 11, 2019, this Motion will refer to all events as having taken place on January 11, 2019, for the sake of brevity.

scene and DNA testing confirmed a match to Jacob Harris. (Ex. 12, Winter Deposition, at 145:10-153:12 and referenced exhibits).

Undercover officers on the ground videotaped the Whataburger armed robbery as it occurred. (Ex. 13, Police Surveillance Video, PHX00073). Officers visualizing the criminal actions of the decedent and his crew provided detailed information about what was occurring over the radio and the CAD. (Ex. 14, Transcript of Phoenix Police radio; Ex. 10, PHX001428-1500, at 1486-1489). As the crimes unfolded, it was reported over the radio that one of the suspects: "guy's got a gun to the guy's head. Brought him into the back room." (Ex. 13, PHX00073 at 1:20-25; Ex. 14 at PHX001643). Officer Bertz received real-time information over the radio about the suspects pointing guns at various individuals inside the Whataburger—the drive-thru clerk, at an employee at a cash register, and directing another employee towards the back office. (Ex. 8, at 204:8-207:11).

The air unit observed Jacob Harris and the Mass Bandits complete the Whataburger armed robbery and enter the getaway vehicle driven by Sarah Busani, the fourth suspect, at 12:11 a.m. (Ex. 9, PHX001526; Ex. 10, at PHX001489-90; Ex. 8 at 207:12-16). The getaway vehicle was observed by Officer Bertz and other officers traveling eastbound on the Interstate 10 before transitioning to the northbound Loop 101. (Ex. 8 at 208:2-3). After the vehicle left the freeway, Officer Bertz and Officer Norman began discussing the tactic that the officers would use to attempt to stop the vehicle, while keeping the public safe at the same time. (*Id.* at 208:14-17). The officers made the decision to deploy a "grappler;" a non-lethal device that connects a fleeing vehicle to a police vehicle.[2] The grappler was chosen because it "eliminates the vehicle's ability to then become a mechanism of harm" by preventing the vehicle from suddenly fleeing, running a red light, or swerving erratically at high speed. (*Id*. at 136:8-20). Officers were unable to deploy the grappler on the freeway due to the speeds and concern for the extreme danger it would create for the public. (*Id*. at 293:16-294:24)

---

[2] *See* The Grappler, https://policebumper.com/ (last accessed Jan. 19, 2022).

4

Eight minutes after the suspects fled from committing multiple felonies at the Whataburger, Officer Norman successfully deployed the grappler and brought the suspects' vehicle to a stop at 12:19 a.m. (*Id*. at 211:11-13; Ex. 10, at PHX001493; Ex. 15, Deposition of Officer Norman, 119:11-121:8). As the vehicle was stopping, Officer Bertz deployed what is known colloquially as a "flashbang" grenade. (Ex. 8 at 211:14-24; Ex. 15, at 91:13-17). The flashbang grenade is a non-lethal device the emits bright light and a loud noise. (Ex. 8 at 62:12-64:1). Officer Bertz deployed the flashbang as an "area denial" tactic; the psychological effect of deploying the flashbang was intended to keep all four suspects in the vehicle once it was stopped and deter them from exiting. (*Id.* at 64:1-11). Officer Bertz' intent was to use the flash-bang as a de-escalation tool to "safely resolve this for everybody involved, including the four that were inside the vehicle at the time," but Harris chose not to comply and fled from the vehicle. (*Id.* at 254:2-255:21).

After the grappler and flashbang was successfully deployed, three of the four suspects did not exit the vehicle. The only person chose to flee was Jacob Harris.[3] The first thing Officer Bertz saw as the decedent exited the vehicle was a "semiautomatic firearm being held in the right hand of the occupant seated or now exiting the backseat of that vehicle." (*Id*. at 212:7-11). Officer Norman also testified to seeing the decedent exit the vehicle with a gun in his hand. (Ex. 15 at 91:15-17). Officer Bertz saw the firearm come[]out of the vehicle and swing[] back towards my direction where I'm at, which is against off to the south and west of where their final stop location was." (Ex. 8 at 212:12-15).

Officer Bertz decided to shoot—firing seven shots two of which hit the decedent—because he knew there was "a school to the north that at these hours, this time of night shouldn't be occupied, a small field to the south, but still a residential neighborhood nearly,

---

[3] Officer Bertz did not know that the person he shot was Jacob Harris until after the shooting took place. (*Id.* at 213:6-10). Notably, Harris had changed clothing in the back of the Honda Passport—leaving his belt on the floor and changing into a different clothing—further evidencing his intent to flee. (Ex. 16 at 519, 614, 668).

as well as a Circle K just to […] the east of us."[4] (*Id*. at 212:16-23; Ex. 16, Phoenix Police Scene Photographs, PHX000339). He knew that the fleeing suspect had perpetrated multiple felonies during the Whataburger robbery and was one of the suspects being surveilled by the air and ground surveillance teams. (Ex. 8 at 213:11-19; 297:20-298:24). Officer Bertz saw the decedent run in the direction of a Circle K, and that "because it was obvious that it was open" with customers present, he believed that the decedent took actions that put those present at the Circle K "in imminent threat of deadly bodily harm"—including the risk that he may take a hostage, or engage in other criminal actions to effectuate his escape. (*Id*. at 214:3-14, 296:25-297:10). Officer Bertz reasonably feared for his own safety because the decedent exited the vehicle with a handgun—choosing not only to flee on foot, but to flee with a dangerous instrument. (*Id*). After the Whataburger robbery, Officer Bertz did not believe that the suspects would peacefully go home and not commit other robberies. (*Id.* at 299:7-11).

The CAD documents that the grappler was deployed at 12:19 AM, and that one subject was reported down within the same minute. (Ex. 10, PHX001493). The aerial unit also confirmed that something had been thrown by the decedent, and that the aerial officer "believe[d] it's a gun." (*Id*). A nine millimeter handgun was photographed several feet away from the vehicle in the direction decedent was feeling. (Ex. 16, at PHX000548-PHX000551. 696-707). The other three suspects—who chose to remain in the vehicle and not flee from police—were taken into custody without incident. This was not the first time that Jacob Harris had fled from a vehicle after being stopped by police following an armed robbery—negating any claim that he fled by mistake, fear, that he lacked motive to flee, and instead showing a plan to flee. (Ex. 17, Tempe Police Report, PHX8014-8019).[5]

---

[4] Plaintiff's independent pathologist concluded that only one of the two bullets that hit the decedent was fatal. The shot to his lower right side was not. (Ex. 21).

[5] Information unknown to officers at the time of the use of force but nonetheless corroborates the officers' versions of events is relevant and admissible. *See Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009) (mental health history of decedent relevant to use of force inquiry); *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 689 (E.D. Mi. 2011) (prior arrests admissible to prove attempt to escape arrest); Fed. R. Evid. 404(b)

### C. FLIR Infrared Footage Captured from 11,000 Feet.

The aircraft involved in the surveillance of the Mass Bandits was a fixed-wing aircraft that flies at approximately 10,000 to 12,000 feet. (Ex. 18, Bundy Deposition, at 22:8-24, 51:2-13; 53:20-54:1). The aircraft followed the Honda Passport for multiple hours as it drove to various locations, was overhead when the armed robbery occurred, followed the vehicle as it fled from the scene, and was overhead when Harris fled from the vehicle—with Officer Bundy reporting information he saw over the radio. (*Id*. at 54:23-57:22; 82:8-86:25; 87:17-91:25). Shortly before, or directly after the shooting, Officer Bundy saw that "something was thrown by that subject." (*Id*. at 58:8-19). Based upon what he observed, Bundy believed that what was thrown was a gun and that it was in reach of the suspect when he fell. Officer Bundy reported that information over the radio. (*Id.* at 82:8-86:25).

The camera that is used with the fixed-wing aircraft has an infrared sensor that is "not actually a camera. It doesn't have camera lenses, it's not recording onto film or a camera-type sensor. It's picking up heat variations." (*Id*. at 24:4-15). The footage does not capture fine details and is not taken from the perspective of the involved officers, but it does accurately capture time frames. (Ex. 19; Ex. 8, at 276:25-277:17). Less than three seconds elapsed from the time that Jacob Harris fled from the vehicle and ran to the period when he fell after being shot twice (*Id.*).

### D. Procedural Background.

Plaintiff initially filed suit in Maricopa County Superior Court against Defendant, the City of Phoenix, and Officer Norman on December 13, 2019. (Doc. 1-3 at 2). Defendants timely removed the action to this Court on January 13, 2020. (Doc. 1). Plaintiff filed his Complaint (doc. 5) in this Court on January 16, 2020. The Complaint alleged a state law wrongful death claim and Fourth, Eighth, and Fourteenth Amendment claims under 42 U.S.C. § 1983. (*Id.* at 4-5). Defendants served multiple written discovery requests, including Rule 36 Requests for Admission.

---

(evidence of other crimes admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

7

Plaintiff did not timely respond to the RFAs. Instead, Plaintiff—without leave of this Court—served late responses that contained numerous boilerplate and irrelevant objections. (Ex. 20, Defendant's Requests for Admission and Plaintiff's Responses). Boilerplate objections are not proper objections. *See Liguria Foods, Inc. v. Griffith Labs., Inc.*, 320 F.R.D. 168, 185-87 (N.D. Iowa 2017), quoting *Walker v. Lakewood Condo. Owners Ass'n.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all."). The RFAs are deemed admitted by operation of law. Fed. R. Civ. P. 36(a)(3). Alternatively, all of Plaintiff's objections should be deemed waived for failure to timely object, and all factually and legally unsupported objections should be stricken. "Once a matter has been deemed admitted under Rule 36, even by default, the court may not consider evidence that is inconsistent with the admission." *Am. Gen. Life & Accident Ins. Co. v. Findley*, No. CV 12-01753 MMM (PSWx), 2013 U.S. Dist. LEXIS 41644, at *6 (C.D. Cal. Mar. 15, 2013).

After extensive discovery, Defendants moved for judgment on the pleadings on May 7, 2021. (Doc. 50). Plaintiff sought to strike (doc. 51) the Motion for Judgment on the Pleadings, which the Court denied on May 14, 2021. (Doc. 60). The Motion for Judgment on the Pleadings was subsequently fully briefed (docs. 73, 77) and submitted to the Court. On October 22, 2021, the Court granted Defendants' Motion for Judgment on the Pleadings. (Doc. 144). The Court concluded that the City of Phoenix could not be vicariously liable for Defendant's use of force as to Count One. (*Id.* at 2-3). The Court also held that Plaintiffs lacked standing to bring a Section 1983 claim on behalf of the decedent under Arizona law. (*Id.* at 4). Finally, the Court concluded that Plaintiffs should not be granted leave to amend their Complaint. (*Id.* at 4-7). After resolution of the Motion for Judgment on the Pleadings, the remaining claim in this case is a wrongful death claim against Officer Bertz for his intentional use of physical force against decedent. (*Id.* at 7).[6]

---

[6] Because all of Plaintiffs' claims under 42 U.S.C. § 1983 were dismissed, Plaintiffs no longer allege the deprivation of a constitutional right by Defendant and proceed on a state law claim only. Although not binding, federal cases are instructive for the resolution

## II. PRINCIPLES OF LAW.

Under Fed. R. Civ. P. 56(a), the court must determine whether there is a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. In making this determination, the court resolves all inferences and views all facts in the light most favorable to the non-moving party. *Nehad v Browder*, 929 F.3d 1126, 1132 (9th Cir. 2019). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

### A. Wrongful Death.

Wrongful death under Arizona law is a creation of statute, not common law. *Walsh v. Advanced Cardiac Specialists Chtd.*, 274 P.3d 645, 648 (Ariz. 2012); A.R.S. § 12-611. Because Plaintiff's remaining claim stems from the use of intentional physical force by Defendant, Plaintiff's claim is an assault and battery tort. *See Vacaneri v. Ryles*, No. CV-13-02252-PHX-PGR, 2014 U.S. Dist. LEXIS 38468 at *5 (D. Ariz. Mar. 21, 2014). Common law battery in Arizona is defined as "an intentional act by one person that results in harmful or offensive contact with the person of another." *Rice v. Brakel*, 310 P.3d 16, 19 (Ariz. Ct. App. 2013). However, under A.R.S. § 13-413, "[n]o person in this state shall be subject to civil liability for engaging in conduct otherwise justified" pursuant to the provisions of Arizona's justification statutes.

### B. Justification.

A.R.S. § 13-409 governs the use of physical force by a law enforcement officer, while A.R.S. § 13-410 governs the use of deadly physical force by a law enforcement

---

of the state law claim. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2013) (affirming district court's summary judgment against plaintiff's state tort claims because they failed for the same reasons as the Fourth Amendment claim); *Liberti v. City of Scottsdale,* No. CV-17-02813-PHX-DLR, 2018 U.S. Dist. LEXIS 154600 at *16 (D. Ariz. Sept. 10, 2018) (noting that the parties agreed that if the conduct was objectively reasonable under Fourth Amendment law the wrongful death would also fail).

officer. Section 13-410(C) states that the use of deadly force against another is justified under Section 13-409 if the officer "reasonably believes that it is necessary:"

> 1. To defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force.
>
> 2. To effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes:
>
> (a) Has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.
>
> (b) Is attempting to escape by use of a deadly weapon.
>
> (c) Through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

A.R.S. § 13-410(C). *See also Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2012) ("The use of deadly force is permissible under Arizona law if an officer reasonably believes it is necessary to effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes … is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.") (internal quotations omitted). If the officer's use of force is justified under Section 13-409, the officer is immune from civil liability under Arizona law. *Ryan v. Napier*, 425 P.3d 230, 239 (Ariz. 2018).

Additionally, an officer is presumed to be acting reasonably if the officer uses deadly physical force against a plaintiff in a civil case to protect himself or "effect an arrest or prevent or assist in preventing a plaintiff's escape" when the plaintiff "is attempting to commit, committing, or fleeing after having committed or attempted to commit a felony criminal act." A.R.S. § 12-716. *See also Ryan*, 425 P.3d at 237 ("[S]tatutory presumptions are triggered when a law enforcement officer intentionally uses physical force to arrest or capture a suspect and the suspect is injured. The officer is 'presumed to [have been] acting reasonably' in using physical force.").

## III. ARGUMENT

### A. Officer Bertz' Actions Are Presumptively Reasonable.

Under A.R.S. § 12-716(A)(1)(a)-(b), a police officer is presumed to be acting reasonably if the officer uses deadly physical force to "[p]rotect himself or another person against another person's use or attempted use of physical force or deadly physical force," or to "effect an arrest or prevent […] a plaintiff's escape." A court need only make such a finding by a preponderance of the evidence. A.R.S. § 12-716(A); *See also Valdez v. City of Phoenix*, No. CV-18-0921-PHX-DGC, 2019 U.S. Dist. LEXIS 182312 at *5-7 (D. Ariz. Oct. 21, 2019). There is no genuine issue of material fact that the presumption applies here. The Complaint concedes that the decedent was attempting to escape from police. (Doc. 5 at 4) (describing the decedent as "running away" from police). Additionally, no reasonable juror could conclude that Defendant and the other Phoenix Police Department officers were not attempting to "effect an arrest" at the time the shooting took place; officers had just observed the decedent and his accomplices (who pled guilty) commit an armed robbery, aggravated assault, and kidnapping at the Whataburger. (Exs. 5 at 7-16, 6 at 8-17, 7 at 7-16, 8 at 208:4-209:22, 9, 13, 14). The presumption of reasonableness under Section 12-716(A) applies. *See Ryan*, 425 P.3d at 237 ("statutory presumptions are triggered when a law enforcement officer intentionally uses physical force to arrest or capture a suspect and the suspect is injured.").

### B. Officer Bertz's Use of Deadly Physical Force Was Justified.

Several Fourth Amendment cases are instructive to this Court's analysis. First, in *Liberti*, 2018 U.S. Dist. LEXIS 154600 at *14, a shooting was deemed reasonable where the suspect "was armed with a dangerous weapon and, at the very least, trying to evade arrest by fleeing into a crowded shopping center." Second, in *Ford v. Childres*, 855 F.2d 1271, 1275 (7th Cir. 1988), an officer responded to a silent holdup alarm at a bank, observed a masked individual standing in the bank with his arm extended toward people with their arms raised. The officer later saw the suspect fleeing the bank with a bag, and the officer yelled at the suspect to stop. When the verbal warnings went unanswered, the officer shot

11

the suspect in the back even though he had never actually seen the suspect with a weapon. *Id*. at 1271. In finding that the officer's actions were objectively reasonable, the court concluded that the "in view of the totality of the information Officer Childers possessed when he fired at Ford, we hold that a reasonable jury could only conclude that Officer Childers had probable cause to believe that Ford possessed a threat of serious physical harm to himself and/or to others." *Id*. at 1276.

Third, in *Dudley v. Eden*, 260 F.3d 722 (6th Cir. 2001), the plaintiff robbed a bank without displaying any weapons, but drove to a parking lot and waited for police. When the officers attempted to arrest him, the plaintiff fled in a vehicle, with police in pursuit. Upon being cut off and stopped, the officer who cut him off shot the plaintiff. The Sixth Circuit recognized that "given Dudley's bank robbery, his refusal to comply with the commands of armed [police officers], his attempt to evade arrest, and his reckless driving, it was reasonable for Officer Eden to conclude that Dudley posed a serious threat to himself and others." *Id*. at 727.

Fourth, in *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991), the officer stopped a car after a pursuit. He ordered those inside the car to raise their hands, but one suspect reached below the officer's sight line and was shot and killed. The Fifth Circuit rejected the argument that there was not a reasonable perception of danger, holding that the officer could reasonably have believed that the suspect retrieved a gun. *Id*. The Fifth Circuit further determined that the absence of a gun was "irrelevant," because what actually mattered was whether an officer has a reasonable believe that a dangerous weapon is in the possession of a suspect and that the suspect may use it. *Id*.

Fifth, in *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992), the Sixth Circuit found that an officer had reasonable justification to use deadly force on a suspect because he believed that a failure to do so could have led to a chain of events that would have posed a danger to others, even if the danger was not imminent or definite: "rather than confronting the roadblock, he could have stopped his car and entered one of the neighboring houses, hoping to take hostages." *Id*.

Sixth, in *Corrales v. Impastato,* 650 F. App'x 540 (9th Cir. May 27, 2016), the Ninth Circuit found that an undercover officer acted reasonably and did not violate the plaintiff's Fourth Amendment rights when the evidence showed the unarmed plaintiff rushed toward the officer with his hand positioned in a way that made the officer believe that the plaintiff had a gun. *Id.* at 541-42. *See also United States v. Martinez-Jimenez*, 864 F.2d 664, 667-68 (9th Cir. 1989) ("Appellant argues that we should put aside this testimony because it was based upon the witnesses' mistaken assessment of the apparent threat. Appellant's argument fails because, during a robbery, people confronted with what they believe is a deadly weapon cannot be expected to maintain a high level of critical perception."); *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 337 (5th Cir. Mar. 19, 2008) (despite the plaintiff being unarmed and shot in the back, the Fifth Circuit found the officers' actions objectively reasonable as a matter of law because, in part, the plaintiff "pointed his cell phone, as most guns are held shortly before they are fired, at an Officer.")

      1.    <u>Officer Bertz Reasonably Believed the Use of Deadly Physical Force by Decedent Was Imminent.</u>

Here, as in *Liberti*, *Ford*, *Dudley, Reese, Smith*, and *Corrales,* Jacob Harris was a dangerous fleeing felon whose actions were reasonably interpreted to represent a deadly threat. In fact, Defendant could not find a case that involved an armed robbery crew who had perpetrated numerous prior dangerous crimes, committed multiple felonies while observed by officers, and then a suspect fled from police when stopped. Officer Bertz testified that at the time the decedent exited the vehicle, he had a gun in his right hand held close up against his right shoulder. (Ex. 8 at 268:10-22). As Harris exited, he was positioned directly toward Officer Bertz and presented an immediate threat: "when that back rear passenger door opens, the first thing that presents itself from that door is a semiautomatic firearm being held in the right hand of the occupant seated or now exiting the backseat of that vehicle. That firearm comes out of the vehicle and swings back towards my direction where I'm at, which is again off to the south and west of whether their final stop location was." (*Id*. at 212:7-215:15, 259:9-264:17, 281:18-283:2). As Harris continued to flee, his

head turned back to look at the Officer Bertz as he began to run. (*Id.* at 213:20-21.). Harris other arm continued running in a swinging motion, but his right arm with the firearm did not and was high and up by his right side with a bent elbow. (*Id*. at 264:6-17; 266:5-268:22). Officer Bertz believed that decedent intended to shoot at him and the other police officers attempting to stop the vehicle while running towards a nearby Circle K. (*Id*. at 212:16-23; 214:3-14)[7] Officer Norman testified in his deposition to seeing the same actions from decedent in the moments before shots were fired. (Ex. 15 at 92:3-14). Officer Bertz was closer to the suspect, and Officer Norman explained that "when that suspect pops out with a gun in hand, I recognize that—that he definitely has an advantage over Officer Bertz. Flash-bang goes off, and the suspect begins to run. I see the suspect look back, kind of quartering, at Officer Bertz, and then maybe a step later looks back again. Gun is still in hand. I feel that he is now about to target Officer Bertz, who he is still pretty close to, and I begin to fire my pistol, which at the same time I recognize Officer Bertz is firing his weapon system as well." (*Id*.).

Plaintiff in the Complaint contends that the video "clearly shows" that the decedent did not turn to his right or make a threatening gesture with the handgun at Officer Bertz. (Doc. 5 at 4). This argument overstates both what Officer Bertz maintains transpired and what the video captures. The decedent turned his head and shoulder to the right, which is consistent with Officer Bertz' statement that he saw decedent "slightly turn back and look in our direction." (Ex. 8 at 261:8-11). Officer Bertz does not contend that the decedent turned his entire body towards him, and the law does not require as much for the decedent to constitute a reasonable deadly threat. *McLaughlin v. United States*, 476 U.S. 16, 17 (1986) ("the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue.") *See also George*, 736 F.3d at 838.

---

[7] However, an officer does not have to wait for a suspect to physically turn towards him or fire his gun before using deadly force. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.")

14

Additionally, Officer Bertz testified that the handgun was close against the decedent's body at this point in time, and that the decedent brandished it towards Defendant and the other police officers as if intending to shoot across his body at the officers. (*Id.* at 264:6-17; 268:10-22). The Air Unit FLIR video is of little value because the decedent appears generally as a white blur and his hands are not clearly distinct, but as the decedent falls the handgun can be seen flying from his hand. It is not "clear" from the footage that the decedent made no "gesture" towards Officer Bertz as Plaintiff contends. In any event, the relevant question is whether it would be reasonable for Defendant to believe the use of deadly physical force was imminent—the answer is yes. *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) ("The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists.");

In addition, Officer Bertz is presumed to have acted reasonably under A.R.S. § 12-716 when using deadly physical force to "effect an arrest" or in "preventing a plaintiff's escape." There is no evidence to rebut this presumption.

### 2. Officer Bertz Reasonably Believed Decedent Had Committed a Felony Involving the Use of a Deadly Weapon

Regardless of whether the decedent was armed as he fled, Officer Bertz' use of deadly physical force was justified under Section 13-410(C)(2) because Officer Bertz reasonably believed that the decedent had committed multiple felonies involving the use of a deadly weapon. See A.R.S. §§ 13-1203 & 13-2014 (aggravated assault); A.R.S. §§ 13-1902 & 1904 (armed robbery); A.R.S. § 13-1304 (kidnapping-restraining another person with intent to otherwise aid in the commission of a felony). Officer Bertz was part of a surveillance team that observed decedent commit an armed robbery, aggravated assault, and kidnapping at a Whataburger with three co-conspirators. He knew that prior to these crimes, the Mass Bandits were believed to be involved with more than two dozen prior similar crimes. Officers observed these felons use handguns in the course of the robbery—pointing them at various Whataburger employees to facilitate stealing money. (Ex. 13; Ex. 14, at PHX001643). Officers observed decedent leave the Whataburger in the same vehicle as the

1  other accomplices. (Ex. 14 at PHX001644). All of this information was broadcast to all
2  officers over the radio, including Officer Bertz—who heard these statements. (Ex. 8 at
3  206:7-207:16). Officer Norman testified to hearing the statements over the radio as well.
4  (Ex. 15 at 86:18-87:8). Additionally, decedent's accomplices admitted under penalty of
5  perjury that decedent entered the Whataburger while armed with a handgun and forcibly
6  took money while armed with a handgun. (Exs. 5-7). There is no genuine issue of material
7  fact that Defendant reasonably believed decedent had committed multiple felony involving
8  the use of a deadly weapon prior to fleeing from the scene.

9  Defendant anticipates that Plaintiff will argue decedent's ongoing flight from law enforcement acts as an intervening event that renders Section 13-410(C)(2) inapplicable. In other words, Plaintiff will likely argue that the time that elapsed form the time that the vehicle fled from the Whataburger to the time that it was stopped, was of sufficient duration that the decedent cannot be considered to be fleeing from the scene of the crime. This interpretation of the statute should be rejected if offered; Section 13-410(C)(1) contemplates an officer's ability to use force against the "use or imminent use of deadly physical force." No such temporal language is included in Section 13-410(C)(2). If the Arizona legislature intended to limit Section 13-410(C)(2) to only imminent or recently committed felonies involving the use of a deadly weapon, it could have said so. *State v. Harm*, 340 P.3d 1110, 1115 (Ariz. Ct. App. 2015) ("[W]hen the legislature chooses different words within a statutory scheme, we presume those distinctions are meaningful and evidence an intent to give a different meaning and consequence to the alternate language."). Moreover, only eight minutes elapsed between when the decedent fled the Whataburger after robbing it and when the Honda Passport was stopped by police. (Ex. 9, PHX001526). It would be absurd, given there is no temporal or spatial limitation on Section 13-410(C)(2), to conclude that less than ten minutes is all that would need to elapse for a person to have no longer "committed a felony involving the use of a deadly weapon."

Additionally, the Mass Bandits were not immediately taken into custody, in part, to reduce the risk that deadly force would be necessary to secure the individuals' arrests. (Ex.

15, at 119:11-121:8). In general, right after the commission of a felony such as an armed robbery, a criminal suspect's adrenaline is running high putting them on "high alert" for law enforcement and more likely to respond violently to an attempt by law enforcement to make an arrest. (Ex. 8 at 115:18-116:13). In addition, the officers lacked any practical opportunity to stop the vehicle earlier because it was already in motion as the suspects exited the Whataburger. (*Id.* at 207:17-21). It would be contrary to the purposes of the justification statute if an officer was penalized for taking a course of action that *reduces* the risk of a violent confrontation between a criminal suspect and law enforcement.

### 3. Officer Bertz Reasonably Believed Decedent Was Attempting to Escape by Use of a Deadly Weapon

Officer Bertz believed the decedent was attempting to escape to a nearby Circle K after exiting the vehicle, either in an attempt to secure an alternative means of transportation or to potentially take one or more hostages. (*Id.* at 228:12-21). Defendant's testimony is corroborated by the fact that radio callouts indicate that the Circle K was in the "line of fire" of officers, meaning that the decedent was heading away from officers in the direction of the Circle K at the time Defendant shot decedent. (Ex. 14, PHX001647). Additionally, Defendant was aware that the decedent had a firearm in his possession from the earlier robbery, and testified at his deposition that he saw decedent with the firearm in his hand as he was fleeing from the vehicle. (Ex. 8 at 259:9-11). Importantly, Defendant testified that he saw the decedent turn his shoulder towards him, as though the decedent was preparing to fire at officers while running towards the Circle K. (*Id.* at 268:10-22).

### 4. Officer Bertz as Attempting to Effect an Arrest and Prevent the Escape of a Person Known to be Likely to Endanger Human Life or Inflict Serious Bodily Injury.

A.R.S. § 13-410(C)(2)(c) also applies to render justified Officer Bertz' actions as Officer Bertz was trying to make an arrest and also prevent the escape of a person known to be likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay. Officer Bertz knew that the decedent had committed upwards of two dozen armed robberies and aggravated assaults, that the Mass Bandits usually committed multiple crimes per night, and that the decedent fled from the vehicle when it

was stopped by police. Officer Bertz had likewise heard over the radio that members of the Mass Bandits had pointed firearms at Whataburger employees and he was concerned that the decedent might run to the Circle K and take a hostage, or commit a car-jacking. (Ex. 8 at 198:1-200:25, 214:3-14, 296:25-297:10).

## IV. CONCLUSION.

Officer Bertz's conduct on January 11, 2019 was justified under three independently sufficient provisions of Arizona law. There is no genuine issue of material fact Officer Bertz reasonably believed that use of deadly physical force by decedent was imminent, that the decedent had recently committed a felony involving the use of a deadly weapon, and that the decedent was attempting to escape police by use of a deadly weapon. Any one of those circumstances establishes that, as a matter of law, Officer Bertz's conduct was justified. Summary judgment in Defendant's favor is warranted.

DATED this 20th day of January 2022.

WIENEKE LAW GROUP, PLC

By: */s/ Christina Retts*
Kathleen L. Wieneke
Christina Retts
Brendan F. Porter
1225 West Washington Street, Suite 313
Tempe, Arizona 85281
*Attorneys for Defendant Bertz*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Stephen D. Benedetto
> William H. Knight
> Heather Hamel
> The People's Law Firm, PLC
> 645 North 4th Avenue, Suite A
> Phoenix, Arizona 85003
> Attorney for Plaintiffs

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is a registered participant of the CM/ECF System:

> N/A

By: */s/ Mica Mahler*