THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
Will Knight (Ariz. Bar No. 30514)
Heather Hamel (Ariz. Bar No. 031734)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834

*Firm email for service of documents:*
admin@the-plf.com

*Attorneys for Plaintiff Roland Harris*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Roland G. Harris; Jessica Perez; and Rodasia White, as Mother and Next Friend of A.H. and J.H., the minor children of decedent Jacob Harris, as beneficiaries for the wrongful death in and violation of civil rights of Jacob Harris,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix, Kristopher and Jane Doe Bertz, David and Jane Doe Norman, et al.,<br><br>Defendants. | Case No. 2:20-cv-00078-PHX-DLR<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT BERTZ'S MOTION FOR SUMMARY JUDGMENT (Doc. 162)**<br><br><br>(Oral Argument Requested) |

Plaintiff Roland G. Harris, by and through undersigned counsel, hereby responds to Defendant Kristopher Bertz's Motion for Summary Judgment (Doc. 162) and respectfully urges the Court to deny that Motion for the most fundamental of reasons:  Defendant's argument hinges on a series of acute factual determinations of the "reasonableness" of his conduct, about which a reasonable jury could easily disagree.  Bertz's motion is a facially inappropriate use of Rule 56 and must be denied.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     Overview

Every civil procedure student has it drilled into their heads during their first year of law school:  The role of the jury is to resolve fact, the role of the court is to instruct on the law.  No matter whether it concerns a claim arising under state law or federal, the issue of reasonableness is "ordinarily a question of fact for the jury."[1]

Here, Officer Kristopher Bertz asks the Court to grant summary judgment on the issue of his affirmative defense of justification—a statutory defense that initially involves five separate determinations of reasonableness.  Specifically, Bertz must prove that a reasonable person would have believed that (1) the use of force was immediately necessary to effect Jacob Harris' arrest or prevent his escape; (2) it was impossible to advise Jacob that he was under arrest before using force; (3) that there was probable cause to arrest Jacob. If Bertz can successfully navigate that gauntlet, his use of deadly force requires him to convince the court that his use of deadly force in this situation was objectively reasonable.

Bertz makes this request of the Court in a case where video evidence not only undermines his own version of the facts that he contends justifies his use of force, but places them in so much doubt that it would be entirely reasonable for a jury to disregard his testimony altogether as untrustworthy.  Seriously entertaining Bertz's request here would require the Court to ignore the video evidence and then invert the burdens of persuasion:  to provide Bertz, the moving party, with the benefits of factual inferences from his own self-serving deposition testimony.

It is difficult to imagine an issue less appropriate for resolution on summary judgment than Bertz's request here.  Thus, after a brief effort to document the true factual disputes at play here, this Response details why the Motion must be denied.

---

[1]  *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012).  *See also Booth v. State*, 83 P.3d 61, 65 ¶ 10 (Ariz. 2004) ("Reasonableness is generally a jury question.")

1

## II.   **Factual Background**

2

A.   The Shooting

3

Shorty after midnight on January 11, 2019, Jacob Harris sat in the rear passenger

4

seat of a Honda Passport being driven by Sariah Busani (the "Honda").[2]   Approximately

5

eight (8) minutes of aerial surveillance video show the Honda driving on the I-10, passing

6

other vehicles but in no way speeding through traffic.[3]   Unbeknownst to Jacob, and the three

7

other occupants of the Honda, they are being followed by Phoenix Police Officers

8

Kristopher Bertz and David Norman—among others, including a fixed-wing aerial

9

surveillance craft specifically intended for covert observation—[4] in unmarked vehicles.[5]

10

At approximately 12:19 a.m., Norman maneuvers his unmarked truck close to the

11

rear of the Honda.[6]   Without activating emergency lights or otherwise indicating the

12

presence of law enforcement,[7] he deploys a device that disables the rear driver's side tire of

13

the Honda and brings it on an immediate stop.[8]   The device is new to Phoenix PD and new

14

to the officers, and is the first time either of them have even seen it in action or used it

15

themselves.[9]   The officers anticipation was building to use the new tool.[10]

16

17

18

    [2] *See* Phoenix Police Department Incident Report 201900055839 at PHX000813-16 (attached as "Exhibit A").

19

    [3] *See* Video Surveillance (attached as "Exhibit 19" to Defendants' Motion for Summary Judgment) at 1:11:33-1:19:45.  *See also* Exhibit 19 Deposition of Kristopher Bertz at 123,

20

239–40, 293 (attached as "Exhibit B"); Deposition of Brent Bundy (attached as "Exhibit C") at 56 (noting "no excessive speeds").

21

    [4] Exhibit B at 16, 205, 208; Exhibit C at 22 ("The fixed-wing surveillance . . . is used when police are attempting to covertly watch a suspect. . . . We are undetectable, for the

22

most part, from the ground both day and night.").

    [5] Exhibit B at 16; Deposition of David Norman (attached as "Exhibit D") at 37.

23

    [6] Defense Exhibit 19 at 1:19:53-1:19:59; Exhibit D at 102.

    [7] *Id.*

24

    [8] *Id.*; Exhibit D at 113.

    [9] *Id.* at 107 ("the Grapplers are pretty new, a new piece of equipment in our -- to our

25

capabilities.  They're a pretty new -- new device that we hadn't really -- I think we had used it one time before, and it was on, like, a very slow-moving vehicle.  So this was one of our

26

first uses of the Grappler.").]
    [10] Exhibit B at 245.

There are no emergency lights or sirens.[11]  There is no indication that the stop has been caused by police, or anyone with lawful intentions—or, for that matter, by something other than a massive mechanical failure.[12]

Before the vehicle even completely stops, Bertz—positioned to the rear passenger-side of the Honda—throws a "flashbang" stun-grenade out his driver's side window.[13]  It lands a few feet from the Honda's passenger-side rear door.[14]  Its explosion causes a flash of light so bright that it will temporarily blind anyone within feet of it (even if their eyes are shut) and a "bang" so loud that it causes psychological disorientation by exerting force on the fluid in the human ear.[15]

Within a second, Jacob opens the rear passenger side door and immediately begins running away from the Honda (and, in turn, away from the undercover officers, who are still positioned behind the Honda in unmarked vehicles).[16]  He runs for 2 seconds.[17] Then Bertz and Norman open fire.[18]

Norman fires four shots, all of which miss Jacob.[19]  Bertz fires seven shots, five of which miss.[20]  The two shots fired by Bertz that strike Jacob are fatal.  Of the officers' collective nine missed shots, at least 2 strike the Circle K convenience store in the distance.[21]

---

[11]  Defense Exhibit 19 at 1:19-43-1:20:00.
[12]  *Id.*
[13]  Defense Exhibit 19 at 1:20:00-1:20:01; Exhibit 2 at 258.
[14]  Defense Exhibit 19 at 1:20:00-1:20:01; Exhibit 2 at 211-12.
[15]  *See* Expert Opinion Bryan Neumeister (attached as "Exhibit F") at PLF001511–12.
[16]  Exhibit 2 at 258–59.
[17]  Defense Exhibit 19 at 1:20:02-1:20:04; Exhibit 2 at 258–59; Deposition of Anthony Winter (attached as "Exhibit F") at 159.
[18]  Defense Exhibit 19 at 1:20:04-120:07.
[19]  Exhibit D at 111.
[20]  Defendants Motion for Summary Judgment ("MSJ") at 5.
[21]  Exhibit F at PHX001512–13. *See also* CAD Report attached to MSJ as Defense Exhibit 10 (Doc. 162-5) ("SHUT DOWN, SOMEONE GOING TO CIRK, GET EVERYONE OUT OF LINE OF FIRE").]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

   B.   Before the shooting

   Before Bertz shot Jacob Harris in the back, he and Norman had been assigned to a case of serial robberies that the Phoenix Police Department committed by a group of young people called the "Mass Bandits."[22]   Bertz and Norman were aware that the group had committed "over two-dozen armed robberies" in the previous weeks.[23]   And they were following the Honda after the group had been involved in a robbery of a Whataburger restaurant (the "1/11 Robbery").[24]

   There is no evidence that the group ever injured anyone in any of the prior robberies, and did not do so in the 1/11 Robbery.   Police had never intervened in any of the prior robberies, and did not do so on 1/11.[25]

   And prior to Bertz's shooting, the entirety of Phoenix PD's investigation of the group—including their monitoring of and response to the 1/11 Robbery—was surreptitious.[26]   They were surveilled for upwards of ten hours, that day, by fixed-wing aircraft designed to be invisible to those it was monitoring.[27]   After the 1/11 Robbery, they were followed by Bertz, Norman, and others—all in unmarked vehicles.[28] And no Phoenix Police personnel (neither Bertz, Norman, nor anyone else) provided any indication to the group that police were aware of their conduct and was attempting to bring them to justice: There were no sirens, no lights, and no announcements.[29]   Just a new vehicle behind them, an unexpected vehicle malfunction, and an explosion a few feet away from the rear passenger-side door.

---

[22] MSJ at 1-3.

[23] *Id.* at 2.

[24] *Id.* at 2-3.

[25] To the contrary, PPD's operations plan was to specifically permit the 1/11 Robbery to occur.  *See* Deposition of Anthony Clement (attached as "Exhibit E") at 93, 119–24.

[26] Exhibit B at 16, 205, 208; Exhibit C at 22 ("The fixed-wing surveillance . . . is used when police are attempting to covertly watch a suspect. . . . We are undetectable, for the most part, from the ground both day and night.").

[27] Exhibit C at 51-52.

[28] *See* note 5, supra.

[29] *See* notes 11-12, supra.

C.    The Aftermath

Phoenix Police Detective Anthony Winter conducted an investigation of the shooting after it occurred—a fact that relevant to this litigation only because of the evidence it produced.

That night, Detective Winter met with Officer Brent Bundy, the pilot who operated the fixed-wing surveillance plane the night of the shooting.  Detective Winter requested a "redacted" copy of the aerial video immediately, rather than waiting for Bundy to impound it the next day.[30]  The redaction process requires "compression" of the digital video file, resulting in a loss of image quality.[31]  In Bundy's 20+ year career, involving hundreds of surveillance flights, it was a "very rare circumstance" when an investigator would request a copy of the video prior to impound.[32]   And then, after his rush collection of the video, Detective Winter curiously decided that he did not need to review the video in order to question, and clear, Bertz and Norman.[33]

The video itself reveals multiple issues to those who actually did view it.  It showed Jacob clearly running away from the vehicle as soon as he exited.[34]  It showed no evidence of his body twisting in any way toward Bertz.[35]  It showed Bertz firing and shooting him within two seconds of him exiting the vehicle.[36]  It showed an object flying out of his hand and landing on the ground, continuing to glow on the thermal camera, long after he was shot.[37]

---

[30] Deposition of Diane Meshkowitz (attached as "Exhibit H") at 8, 21-22.
[31] *Id.*
[32] Exhibit C at 36.
[33] Exhibit F at 101–102 ("Everybody asks me all the time, and I'm like no, I don't want to watch the video.")
[34] Defense Exhibit 19 at 1:20:01-1:20:03.
[35] *Id.*
[36] *Id.* at 1:20:04-120:07.
[37] *Id.* at 1:20:07-end.

C.     Disputed Allegations of Fact and Inferences therefrom[38]

In the Motion, Bertz relies on a series of additional "facts" that are unsupported by the exhibits he cites, disputed by the Plaintiff, or both.

*Disputed Fact #1:  Jacob was photographed, prior to the 1/11 Robbery, with the Taurus handgun in his waistband.*[39]     Bertz's allegation on this point, for which he

 

generically cites Exhibit 11 as support, is simply false.   The numerous surveillance photographs at Exhibit 11 show Jacob and the group holding a silver weapon.  Bertz's own motion acknowledges that the silver weapon was an "Airsoft" air-gun (pictured below, left).  The Taurus 9mm handgun found on the scene (pictured below, right) is black.  The photos in Exhibit 11 are all of the silver air pistol, not the black handgun.[40]

 

---

[38] Pursuant to the Court's orders regarding dispositive motion briefing, this section of the Response details the allegations of fact that are disputed, undermined by the evidence itself, or both.
[39] *See* MSJ at 3:20–23.
[40] *Id.*

*Disputed Fact #2:  The Taurus was photographed at the scene, a matter of feet from where Jacob feel after he was shot.*[41]  Bertz's factual allegations that the Taurus "was photographed" at the scene has no support in the record.  Bertz relies on testimony from Winter to conclude that the weapon had Jacob's DNA on it, Winter himself testified that he did not know where the gun was found (not to mention that he is not a DNA analyst).[42]  Indeed, Bertz has produced *no* admissible evidence identifying where the gun was found, who found it, or who took the photograph attached to the Motion.  And the person presumably most knowledgeable about the photograph—the scene investigator, Jennifer DiPonzio—was never made available for a deposition in this case despite multiple requests by Plaintiff's counsel and a host of varying explanations by the defense.

*Disputed Fact #3:  Officers Bertz and Norman chose to use the grappler on the Honda for reasons of public safety, "because it eliminates the vehicle's ability to become a mechanism of harm."*  Bertz cites his own self-serving deposition testimony in support of Norman's purported motive for deploying the grappler.  But this is not the only reasonable inference to be drawn from the facts.  Both Bertz and Norman testified that the grappler was new to them and they had only recently received training on it, and they were excited about using it.[43]  Bertz had never used the device before, and Norman had only used it three times in training.[44]  While it is reasonable to infer that Bertz and Norman were motivated by public safety concerns, it is equally reasonable to infer that they were excited by the opportunity to use a new tool in the field for the first time ever.  In fact, Bertz conceded as much.[45]  Additional support for such an inference is drawn from their decision to open fire at Jacob with a Circle K convenience store as a backdrop—suggesting a willful disregard of (rather than a deep concern for) public safety.

---

[41] *Id.* at 3:24, 6:17–18.
[42] Exhibit G at 120-21.
[43] Exhibit B at 130; Exhibit D at 11–12; Exhibit E at 63.
[44] *Id.*
[45] Exhibit B at 246.

*Disputed Fact #4:  Bertz deployed a flash-bang stun grenade as to "de-escalation tool" to "safely resolve this for everybody involved."*  Bertz admits that he threw the flash-bang, immediately after the Honda was disabled, and he doesn't claim to have seen the gun he alleges Jacob pointed at him until "immediately after."[46]   A flash-bang stun grenade emits 8 million lumens of light, in addition to a loud explosion sound of 170+ decibels.[47]  The effect "would be blinding to the photoreceptors of the human eye" with the explosion causing "disorient[ation] to the equilibrium due to sound pressure impact on fluid in the human here."[48]  The grenade's effect is so intense that, from a meter away, the device "can cause permanent blindness, even with eyes closed as the magnesium power is that bright."[49]  Bertz, who is responsible for training Phoenix Police officers in the use of stun grenades, is well aware that these effects are physiologically disorienting at up to 100 yards away, they are not supposed to be deployed as close as it was to either Jacob *or* the officers themselves.[50]  He also trains officers that, for this very reason, they must tell each other before deploying a stun grenade. [51]  Here, Bertz threw the grenade closer than his own training indicates is safe, without giving anyone notice.[52]

*Disputed Fact #5:  Bertz's shooting was based in part on Jacob's history of fleeing law enforcement.*  Bertz suggests in his Motion that Jacob had previously fled from officers, as a juvenile.  But Bertz indisputably had no knowledge of this at the time:  He did not even know who Jacob Harris's name at the time of the shooting, much less anything about Jacob's juvenile record.[53]  Jacob's prior flight—which did not involve violence of any kind, but merely an attempt to hide from a perceived threat—was only discovered during the

---

[46] Exhibit B at 258.
[47] Exhibit F at PLF001507, 1510.
[48] Exhibit F at PLF001510.
[49] *Id.*
[50] Exhibit B at 23–26.
[51] Exhibit B at 37–38, 70–76.
[52] Exhibit B at 194–96.
[53] Exhibit B at 213.

1   course of litigation, in response to a subpoena for his juvenile record.  It had no absolutely

2   bearing on Bertz's decision-making that night.[54]

3       *Disputed Fact #6: Bertz saw Jacob exit the vehicle, with a "semiautomatic firearm*

4   *being held in the right hand of the occupant seated or now exiting the backseat of that*

5   *vehicle" and saw Jacob "swing back towards" him.*  In support of this fact, Bertz relies on

6   his own deposition testimony.  That testimony is directly undermined by the video itself,

7   which shows Jacob running away and not turning at all.  It is further undermined by expert

8   testimony that, given the intensity of the stun grenade, Bertz "was either turned away, in

9   which case he would not have seen what was happening at the suspect's car" or would have

10   been blinded by the light emitted by the stun grenade.



**Figure 1:  Exhibit to Bryan Neumeister expert opinion**

24   Plaintiff's police practices expert, Timothy T. Williams, a retired LAPD Detective, opines

---

[54] *Id.*

1   that video shows Jacob running and not turning at all.[55]  It is entirely plausible—if not

2   likely—that a jury could interpret this evidence in the same fashion.

3       *Disputed Fact #7:  The Aerial Video footage was not taken by a "camera" and does*

4   *not capture "fine details."*  Bertz's suggestion that the most important evidence in this

5   case—the video footage actually depicting the shooting—was not taken by a "camera" and

6   is therefore somehow untrustworthy must be rejected out-of-hand.  Officer Brent Bundy

7   specifically testified that the Fixed-Wing aircraft is equipped with an "infrared camera."[56]

8   Known as "Stealth," the device has a "variety of cameras and sensors on it," including

9   standard and infrared, and the tactical flight officer decides which to film.[57]  The degree of

10  details that the camera detects, and its accuracy, is evident to the lay viewer with the naked

11  eye.  And Bundy himself actually suggested that the aerial view is superior to the vantage

12  point of officers on the ground.[58]

13      *Disputed Fact #8:  Bertz served Requests for Admission to which Plaintiff did not*

14  *timely respond.*  Finally, Bertz accuses Plaintiff of failing to respond to Requests for

15  Admissions, claiming that he "served multiple written discovery requests, including rule

16  36 Requests for Admissions."[59]  It is unclear why he exactly Bertz dedicates space in his

17  Motion to this allegation, as the Motion itself does not contain any discussion of the issue

18  after its introduction.  More fundamentally, Bertz's claim of serving RFAs is simply untrue.

19  Counsel engaged in lengthy back-and-forth with defense counsel on this issue, and

20  Plaintiff's counsel has detailed at length—on numerous occasions—that the RFAs were

21  never "served" as required by Rule 34.  Bertz's position, that the RFAs "were served

22

23      [55] Expert Report of Timothy T. Williams (attached as "Exhibit K").

24      [56] Exhibit C at 24 (FLIR is called "Stealth" and has a "variety of cameras and sensors
    on it," including standard and infrared, and the tactical flight officer decides which to film).
        [57] Id.

25      [58] Exhibit C at 18:1-5 ("[On the ground] you have a very two-dimensional view of
    what's going on.  You can only see what's in front of you and what's directly around you

26  on the same level. From the air you can see almost everything.").]
        [59] MSJ at 7:25-8:13.

1    appropriately, via email" simply does not comport with Rule 5, given that counsel did not

2    enter into any written agreement regarding Rule 5 service via email.[60]   Here, too, Bertz

3    makes allegations without any support in the factual record, in the face of the evidence,

4    and for an unknown strategic reason.

5    **III.    <u>Standard of Review</u>**

6            On summary judgment the District Court is obligated to view the evidence in the

7    light most favorable to the non-moving party.[61]  Stated otherwise, summary judgment must

8    be denied unless, after a review of the evidence, it is apparent that no reasonable jury could

9    possibly agree with the arguments of the non-moving party.[62]  The substantial burden of

10   establishing entitlement to summary judgment is particularly weighty in two situations

11   applicable to Bertz's motion:    Issues hinging on a factual determination of

12   "reasonableness," and cases involving of witness credibility.

13           As to the former, Arizona courts have consistently held that "reasonableness is

14   generally a jury question."[63]  When the elements of a cause of action or affirmative defense

15   require a determination of reasonableness, "a court may grant judgment as a matter of law

16   only if no reasonable jury could find the defendant's conduct unreasonable."[64]  Ninth Circuit

17   case law is in accord:   "Summary judgment is generally in inappropriate way to decide

18   questions of reasonableness because the jury's unique competence in applying the

19   reasonable man standard is thought ordinarily to preclude summary judgment."[65]   And

20           [60] *See* Fed. R. Civ. P. 5(b) (service may be made by handing it to the person, leaving it
21   at their office, mailing it to their last known address, or sending it to "by other electronic
     means consented to in writing").
22           [61] *San Diego Police Officers' Ass'n. v. San Diego City Emples. Ret. Sys.*, 568 F.3d
     725, 733 (9th Cir. 2009).
23           [62]  *George v. Edholm*, 752 F.3d 1085, 1101 (9th Cir. 2014) (summary judgment should
     not be granted unless "no reasonable jury viewing the summary judgment record could
24   find by a preponderance of the evidence that the plaintiff is entitled to a favorable
     verdict").
25           [63] *Booth v. State*, 83 P.3d 61, 65 ¶ 10.
             [64] *Id.* at 65-66, ¶ 11.
26           [65]  *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 868 (9th Cir. 2010) (quoting *Gorman v.
     Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009).

although this case no longer involves section 1983 claims, the Ninth Circuit has consistently held that reasonableness in that context is a determination properly made by a jury.[66]

Beyond the inherently fact-intensive determinations of reasonableness, issues of witness credibility nearly always must be submitted to jury.  The United States Supreme Court has expressly noted that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."[67]  As a matter of law, a credibility issue is raised when the nonmoving party in a motion for summary judgment produces "evidence directly contrary to that offered by the movant."[68] In such situations, courts must treat the non-moving party's evidence "as if it were true."[69] As a result, the Ninth Circuit has noted that witness credibility "is almost categorically a trial issue, which means that if bias is an evident factor, summary judgment is not generally indicated."[70]  And when the key witness's credibility is placed into question – even just by a credible allegation of bias – summary judgment generally must be denied.[71]

Or, as articulated by the Federal Circuit,

> Summary judgment should not be denied simply because the opposing party asserts that the movant's witnesses are not to be believed.  *However, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses.*[72]

---

[66] *See, e.g.*, *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011); *Yong Ho Choi v. Gaston*, 220 F.3d 1010 (9th Cir. 2010); *Kanekoa v. Honolulu*, 879 F.2d 607, 612 (9th Cir. 1989).

[67] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986).

[68] *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

[69] *Id.*

[70] *Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1042-43 (9th Cir. 2011).

[71] *CNET Networks, Inc. v. Etilize, Inc.*, 584 F. Supp. 2d 1260, 1275 (C.D. Cal. 2008). *See also Alameda Books*, 631 F.3d at 1042 (Where bias is legitimately at issue, it must be resolved by a jury "since evidently biased testimony is not generally convincing") (*citing United States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465 (1984)).

[72] *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) (emphasis added).

1
2

## IV. BERTZ'S ARGUMENT HINGES ON MULTIPLE DETERMINATIONS OF "REASONABLENESS," IS INHERENTLY FACT-INTENSIVE, AND IS INAPPROPRIATE FOR SUMMARY JUDGMENT.

3

4

5

6

7

8

The first fatal flaw in Bertz's request for summary judgment lies in his contention that this is one of the extraordinary cases where a judge can and should make a determination of reasonableness. Specifically, Bertz contends that he is entitled to a presumption of reasonableness, and that his shooting of Jacob was justified under Arizona's justification laws. Bertz's proposed legal analysis sets forth a gauntlet of "reasonableness" determinations that are readily exposed by any fair look at the case law.

9

10

### A. Bertz has not established his eligibility for Arizona's statutory presumption of reasonableness.

11

12

Bertz's first argument—that he is entitled to a presumption of reasonableness under A.R.S. § 12-716(A)(1)(a)-(b)—both mischaracterizes the law and ignores the hotly disputed facts that underlie it.

13

14

15

16

17

18

19

20

As a threshold matter, Bertz selectively ignores a vitally important portion of the justification statute. Bertz claims that, under A.R.S. section 12-716(A)(1), a police officer is presumed to be acting reasonably if he uses deadly force "to protect himself or another person's use or attempted use of physical force or deadly force <u>or</u> to effect an arrest or prevent . . . a plaintiff's escape." But Bertz omits the precondition to the application of this presumption: Before the Court may even consider these issues, it must <u>first</u> reach a conclusion that the plaintiff "is attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act."

21

22

23

24

25

26

Bertz does not, and cannot, argue that Jacob was "attempting to commit" or was actively "committing" a felony at the time he used force. To be entitled to the presumption of reasonablenss, therefore, Bertz must prove by a preponderance of the evidence that Jacob was "fleeing after having committed [a felony]." Section 12-716 does not define the term "fleeing," but other Arizona authority suggests that the very notion of "flight" requires proof

of a person's attempt to evade police.[73]  In *State v. Randall*, the Arizona Court of Appeals held that the definition of "flight" is inherently linked with the desire to evade arrest: "Flight, in criminal law, is defined as 'the evading of the course of justice by voluntarily withdrawing oneself in order to avoid arrest or detention . . . not merely leaving, but a leaving or concealment under a consciousness of guilt and for the purpose of evading arrest."[74]  In *State v. Martinez*, the Arizona Court of Appeals held that, to establish unlawful flight, the government must prove that a defendant "willfully fled or attempted to elude a pursuing official law enforcement vehicle" <u>and</u> "the law enforcement vehicle was appropriately marked showing it to be an official law enforcement vehicle."[75]  Both holdings are in accord with Ninth Circuit case law arising in the criminal context, that the propriety of a flight instruction hinges on a determination of "whether the defendant knew the police suspected him of a particular crime" and "whether the defendant fled immediately after the crime."[76]  They also comport with common sense:  A man cannot be said to be fleeing law enforcement if he is merely running from something or someone who presents as a threat, without knowing it is a police officer wishing to arrest him.

In short, if Bertz wishes to benefit from the section 12-716's presumption of reasonableness, he must prove that Jacob was fleeing from police at the time he was shot. The undisputed evidence on this point is as follows:

- Jacob and the occupants of the Honda had been involved in as many as "two dozen" prior robberies with no police interdiction to date;

- The 1/11 robbery happened approximately 8-minutes before the car was

---

[73]  *See Stambaugh v. Killian*, 398 P.3d 574, 575 (Ariz. 2017) ("In construing a specific provision, we look to the statute as a whole and we may also consider statutes that are *in pari materia* — of the same subject or general purpose — for guidance and to give effect to all of the provisions involved.").

[74]  443 P.2d 434, 438 (Ariz. App. 1968) (quoting *People v. Herbert*, 196 N.E. 821, 825 (Ill. 1935)).

[75]  284 P.3d 893, 895, ¶ 8 (Ariz. App. 2012).

[76]  *United States v. Dixon,* 201 F.3d 1223, 1232 (9th Cir. 2000).

unexpectedly disabled—a period of time during which Jacob and the occupants of the Honda were driving just slightly faster than other traffic on the road, stopping at red lights, and were being followed by plainclothes officers in unmarked vehicles;

- None of the unmarked police vehicles who were surreptitiously following the Honda activated their lights or sirens at any time before Jacob was shot;

- Norman disabled the vehicle using "grappler" technology that was new to the police department and by definition not widely familiar to the public;

- Bertz deployed the flashbang grenade a matter of mere feet from the rear passenger side door in which Jacob was seated, emitted a light so bright it would temporarily blind a person and a bang so loud it would physically disorient them by altering their fluid in their ears;

- Within 1 second of the grenade's explosion, Jacob exited the vehicle and began running; and

- Bertz began shooting within 2 seconds.

On summary judgment, Plaintiff is entitled to all reasonable inferences from the foregoing evidence. And Bertz's only evidence of flight, the complaint's quotation of Officer Norman's police report, is a blatantly misleading characterization. Bertz does not direct this Court to a shred of evidence suggesting that Jacob was aware he and Norman were police and he was trying to evade them. And if the Court rejects Bertz's argument on this point, as it should, no further analysis is necessary.

### B. <u>There are, at a minimum, obvious factual disputes about whether Bertz's use of deadly force was reasonably necessary.</u>

Even if the statutory presumption were not barred by the facts, Bertz would still have to satisfy Arizona's justification statutes: the two-part, multi-element analyses of A.R.S. § 13-409 (concerning justification for the use of force) and A.R.S. § 13-410 (concerning

justification for the use of deadly force).[77]

A.R.S § 13-409, concerns an initial determination that a person has the right to use force. Section 13-409 provides that a person may use physical force only when he is making an arrest or preventing the escape or arrest of another, <u>and</u> when "all" of the following three factors exist:

> (i)    A "***reasonable person***" would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape;

> (ii)    The person using force makes known the purpose of the arrest, or "***reasonably believes***" it cannot be made known to the person;

> (iii)    A "***reasonable person***" would believe the arrest to be lawful.[78]

Section 13-410 imposes additional requirements for the use of deadly force.  It provides that, in addition to the requirements of section 13-409, a peace officer may use deadly force "only when the peace officer reasonably believes it is <u>necessary</u> to defend himself or a third person from . . . the use or imminent use of deadly force, or to effect the arrest or prevent the escape from custody of a person whom the peace officer "***reasonably believes***" that it is necessary:

> (1) To defend himself or a third person from what the peace officer "***reasonably believes***" to be the use or imminent use of deadly physical force; and,[79]

> (2) To effect an arrest or prevent the escape from custody of a person the peace

---

[77] A.R.S. § 13-410, which focuses on the use of deadly force, specifically implicates the elements of section 13-409 as a prerequisite for application.  *Id.* (creating additional requirements for "the use of deadly force by a peace officer against another . . . pursuant to section 13-409").

[78] Emphasis added.

[79] A.R.S. § 13-410 omits a conjunction, and does not clarify whether the elements are inclusive or exclusive.  Read in conjunction the remainder of the statute, however, the only logical provision is that both subsections (1) and (2) must be satisfied.  Were it otherwise, the statute would justify the use of deadly force against anyone who has committed a felony involving a deadly weapon, and the standard for "threatening" use of deadly force under section A would be more exacting than the standard for actually using deadly force under section C.

officer "***reasonably believes***" (a) has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon; (b) is attempting to escape by use of a deadly weapon; (c) through the past or present conduct of the person which is known to the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay; or (d) is necessary to lawfully suppress a riot if the person or other person participating in the riot is armed with a deadly weapon.

In sum, the two statutes collectively raise five distinct and individual issues on which Bertz must prove that he acted as a reasonable officer would under the circumstances: (i) First, in deciding that deadly force was immediately necessary to effect Jacob's arrest, (ii) Second, in believing that it was necessary to use deadly force before announcing the arrest, (iii) Third, in believing that he had probable cause to arrest Jacob, (iv) Fourth, in concluding that deadly force was necessary to defend himself or third persons from imminent deadly force by Jacob; and (v) Finally, in meeting at least one of the four statutory requirements for the use of deadly force under section 13-410.

The Court need not conduct an exhaustive analysis into each of these factors. The failure of any one is enough. And the disputed facts, set forth above, easily defeat Bertz's foremost among these is whether Jacob posed any threat (much less an imminent deadly threat) to Officer Bertz or anyone else.

## C.     Bertz's reliance on federal 1983 case law is misguided.

In an attempt to bolster is argument for reasonableness on summary judgment, Bertz looks to cases around the country for favorable interpretations of "reasonableness." The results of his efforts are five cases from five different circuits—each of which discusses the reasonableness standard for the purposes of section 1983 excessive force cases. As an initial matter, none of these cases involves any factual dispute approaching the significance of the

one present here—where Bertz's own sworn testimony is contradicted (or, at a bare minimum, placed strongly into question) by video of the shooting.

More importantly, however, Bertz's reliance on these cases in support of his statutory justification argument simply misses the point. *Graham v. O'Connor* sets forth a general standard for resolving the reasonableness of use of force in the 1983 context. But this is not a 1983 excessive force case. And a general determination of overarching "reasonableness" of an officer's use of force under *Graham* is not at issue in this case.

To establish his entitlement to the affirmative defense of statutory justification under sections 13-409 and -410 for his use of deadly force, Bertz must establish his reasonableness as to the five unique elements established by those statutes.[80] His reliance on generalized 1983 case law is therefore misplaced. And, even if it were not—even if this Court were willing to conclude that the *Graham* factors were interchangeable with the justification statutes—a reasonable jury could still conclude, as Plaintiff's police practices expert did, that Bertz's use of deadly force here was objectively unreasonable.[81]

## V. **IN LIGHT OF THE VIDEO, A REASONABLE JURY COULD REJECT BERTZ'S VERSION OF THE EVENTS AS UNTRUSTWORTHY.**

It is axiomatic that determination of witness credibility issues is left to the jury. "Just as "[i]t is emphatically the province and duty of the judicial department to say what the law is, it is emphatically the province and duty of the jury to determine the weight and credibility of the testimony of witnesses."[82] The "very essence" of the jury's function "is to select from among conflicting inferences and conclusions that which it considers most

---

[80]   In *Ryan v. Napier*, the Arizona Supreme Court found reversible error in an expert witness's opinion that the *Graham* standard for reasonableness was synonymous with reasonableness standards established by Arizona's justification statutes. 425 P.3d 230, 242 (Ariz. 2018). While stopping short of clarifying that these are separate statutes, the Court's dicta strongly suggested that this was an improper interpretation of law.

[81]   *See* Williams Report at PLF001477, ¶ 1.

[82]   *United States v. Preston*, 837 F.3d 829 (9th Cir. 2017) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *Allis v. United States*, 155 U.S. 117, 121 (9th Cir. 2015).

1  reasonable."[83] This is the "exclusive function" of the jury.[84]  And when a witness's account

2  is unlikely, the "jury is entitled to reject the testimony in its entirety, disbelieving both the

3  reasonable and the unreasonable aspects."[85]

4         Here, Bertz testified under oath, in deposition, as to a very specific explanation of

5  what happened when Jacob exited the vehicle:

6              The door can only open so far.  The first thing that comes out
               is a gun in the right hand, turned like this.  From there, it
7              becomes turn and move this direction, the gun held high,
               looking back.  Left arm is pumping, right arm is stationary,
8              holding the gun.  Still semi pointed back in my direction, still
               looking back at me as he starts to take his trajectory south and
9              east across the road.[86]

10 Norman testified differently, claiming that after the flashbang, Jacob opens the door and

11 "begins to run"—then "looks back at [Bertz] once and then quickly after that looks back at

12 him again."[87]  Plaintiff's expert, Bryan Neumeister, opines that given their proximity to the

13 flash bang neither Bertz nor Norman would have been able to see much of anything.  And

14 the aerial camera view, while not perfect, makes clear that Bertz's very clear testimony

15 about Jacob running with his arm and torso turned toward him appears to be a work of

16 fiction.[88]  A reasonable jury could accordingly reject *all* of Bertz's testimony.

17 **VI.   CONCLUSION**

18        On January 11, 2019, Kristopher Bertz threw a flashbang a few feet from Jacob

19 Harris's car door, and opened fire 3 seconds later—shooting Jacob in the back as he ran in

20 the opposite direction.  Bertz's claim to justification, on summary judgment, is simply not

21 appropriate.  There is no way to square it with the evidence or the law.  It must be denied.

22

23        [83] *Fountila v. Carter*, 571 F.2d 487 (9th Cir. 1978) (quoting *Tennant v. Peoria &*
24 *P.U.Ry.Co.*, 321 U.S. 29, 35 (1944)).
           [84] *United States v. Shelton*, 588 F.2d 1242, 1245 (9th Cir. 1978).
25        [85] *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir. 2004).
           [86] Exhibit B at 289-90.
26        [87] Exhibit D at 110, 118.
           [88] *See* Video of Norman and Bertz testimony (attached as "Exhibit J").

1    DATED this 23rd day of March, 2022.

2                                              THE PEOPLE'S LAW FIRM, PLC
                                               645 North 4th Avenue, Suite A
3                                              Phoenix, Arizona  85003

4

5                                              By:  s/ Stephen D. Benedetto
                                                   Stephen D. Benedetto
6                                                  William H. Knight

7

**CERTIFICATE OF SERVICE**

8

9        I hereby certify that on March 23, 2022, I electronically transmitted the attached

10   document to the Clerk of the Court using the ECF System. This document and the Notice

11   of Electronic Filing were automatically served on the same date to the following, who are

12   registered participants of the CM/ECF System:

13   Kathleen L. Wieneke
     Christina Gail Retts
14   Brendan F. Porter
     WIENEKE LAW GROUP PLC
15   1225 W. Washington St., Suite 313
     Tempe, Arizona  85281
16   kwieneke@wienekelawgroup.com
     cretts@wienekelawgroup.com
17   bporter@wienekelawgroup.com

18   By:  /s/ Stephen D. Benedetto
19        *An employee of The People's Law Firm*

20

21

22

23

24

25

26